[No. B004352. Second Dist., Div. Two. Dec. 20, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS EARL HELTON, Defendant and Appellant.

## COUNSEL

Susan L. Wolk, under appointment by the Court of Appeal, and Thomas Earl Helton, in pro. per., for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Anderson and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.**—Thomas Helton appeals from his conviction of assault with intent to commit rape and first degree burglary. We affirm.

On the evening of October 7, 1982, Carlu Hermann and her husband Phillip were watching television in the den of their house at 8026 Lessner. After 11 Mr. Hermann left for bed. Mrs. Hermann fell asleep on the sofa watching television. She was awakened by a man straddling her. She screamed her husband's name once before the attacker put his hand over her mouth and told her to be quiet. He tried to lift up Mrs. Hermann's nightgown. Mrs. Hermann's scream woke her husband. He tried to enter the den, but the door had been locked by the intruder. Hearing Mr. Hermann's hand at the door, the attacker sprang up and fled the house.

Mrs. Hermann described her assailant to police as approximately 5 feet 9 inches tall, weighing 160 pounds. He had brown, shoulder-length, straggly hair, a moustache and a goatee.

On October 8 while cleaning the den Mrs. Hermann found a set of keys under a cushion of the sofa. They bore two tags, one marked "Shotgun," the other indicating that it was the property of the Cincinnati Police Department. The Hermanns gave the keys to the police.

On October 11 Detective Mehringer took the keys to 8122 Lessner, Helton's residence. He showed them to Charles Parks, one of Helton's housemates. Mr. Parks turned and shouted, "Jan, they found Shot's keys." The keys were linked to a Pontiac with Ohio license plates parked in the driveway. Officer Mehringer then arrested Helton at his place of work. He noticed that Helton had recently shaved his chin, evident because it was a lighter shade than the rest of his face. Helton said that his nickname was "Shot" or "Shotgun." On November 15, Officer Mehringer again spoke with Mr. Parks, who stated that Helton had shaved off his goatee two or three days before his arrest.

On October 12 Mrs. Hermann viewed a police photo display which included a picture of Helton. She picked out someone other than Helton as her attacker. That evening she attended an in-person lineup. She again failed to select Helton. However, she positively identified Helton both at his preliminary hearing and at trial.

Virginia Soo Hoo-Baxter, Helton's next door neighbor, testified that normally the Pontiac was parked on the street. After the assault it was kept behind the gate, with trash cans placed in front of the license plate.

Helton did not testify, but maintained an alibi defense. He presented testimony that he had shaved his goatee about a week before the assault. He presented testimony that he also lost his keys at the same time, before the attack on Mrs. Hermann. His girlfriend, Jan Keller, testified that she slept with him the night of the assault. She did not recall his leaving the bed after retiring.

 Helton makes many assignments of error, none very substantial. He first asserts that his right to voir dire the prospective jurors was impermissibly restricted, because the court did not permit inquiry about the manner in which the jurors would consider his girlfriend's testimony.

Our system of justice highly esteems the right of trial by jury. An important corollary is the right to probe the veniremen for possible bias and prejudice. However, the importance of voir dire does not blind us to the fact that it can be abused. In theory, the attorneys try to select neutral and unprejudiced jurors; in practice, each strives to mold a panel favoring his side. To this end, mind-numbing quantities of time may be exhausted interrogating the veniremen. In big cases voir dire may continue wearyingly for weeks or even months. This contrasts unfavorably with, for example, England, surely not an underdeveloped state jurisprudentially, where voir dire is completed in substantially less time, with results not noticeably inferior.

■ Be that as it may, the relevant principles are announced in *People v. Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869]. "[C]ounsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*Id.*, at p. 407.) On the other hand, "it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' [Citations omitted.]" (*Id.*, at p. 408.) The court has the power, in its sound discretion, to control the voir dire. (*People v. Wells* (1983) 149 Cal.App.3d 721, 726 [197 Cal.Rptr. 163].)

■ In the case at bench, defense counsel stated, "It's clear a girlfriend has an interest to lie. I just want to make sure that the jurors don't automatically, before they hear her testimony, say she's lying because she's the girlfriend." The trial court barred this line of questioning on the ground that the defendant was trying to educate the jurors and induce them to prejudge the evidence. We cannot say that the court abused its discretion in doing so.

■ Helton next claims that the evidence was insufficient to support the conviction. On appellate review, we must decide whether there is substantial evidence to support the conviction, viewing the evidence in the light most favorable to the verdict. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) As often happens, Helton apparently mistakes a conflict of evidence for an inadequacy of evidence. At trial, the victim positively identified the defendant as her assailant. Moreover, the defendant's keys were promptly found in the victim's sofa where the attack had occurred. There was evidence that Helton moved his car from its accustomed station, concealing its distinctive Ohio license plate; and that he shaved his beard after the attack. While Helton may not find some of this evidence "convincing," it is plainly sufficient to sustain the verdict.

■ Helton's next assignment of error is that the trial court denied him his right to impeach Mrs. Hermann. She testified that she saw Helton drive by on two occasions. Helton sought to impeach her with an affidavit which she signed in trying to get an injunction against him. The affidavit alleges that Helton "continually" drove in front of her house. In addition to the inconsistency, Helton asserts that the affidavit shows bias against him.

The attempt to get an injunction demonstrates not animus, but fear, and thus has little or no impeachment value. In this context the difference be-

tween "twice" and "continually" is trivial. The proposed impeachment would have been on a collateral matter. The rule is that "[w]hile collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury." (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 742 [94 Cal.Rptr. 405, 484 P.2d 77].) The trial court may in its discretion exclude relevant evidence if it is likely to be confusing or a waste of time. (Evid. Code, § 352.) We find no abuse of discretion.

Helton complains that he was not permitted to present hearsay evidence through housemates Jan Keller and Carleen Garner as to when the keys were discovered missing. We find any such error to be harmless, because the excluded evidence was merely cumulative of properly admitted evidence. Such evidence included Ms. Keller's testimony that she last saw Helton's keys on October 4, and loaned him her keys the following day; Ms. Garner's testimony that she never saw the keys after October 5; and Mr. Parks' testimony that when he was interviewed by the police on October 11, he told them that the keys had been missing for about a week.

■ Finally, Helton asserts that the court erred in not instructing the jury *sua sponte* on the lesser included offense of attempted rape. His attorney plainly indicated that he rejected such instructions as a matter of trial tactics. It is obvious that the court has no duty to force instructions on an unwilling defendant. (*People* v. *Allums* (1975) 47 Cal.App.3d 654, 663 [121 Cal.Rptr. 62].) Such "error" would be invited error of the most egregious sort. (*People* v. *Adrian* (1982) 135 Cal.App.3d 335, 342, fn. 8 [185 Cal.Rptr. 506].)

We have examined appellant's other contentions and find them to be meritless. The judgment is affirmed.

Compton, J., and Gates, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 14, 1985.